UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NANCY NEWBURY, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | C.A. No. 24-84WES |
| UNITED STATES HOUSING AND URBAN | : | |
| DEVELOPMENT, et al., | : | |
| | : | |
| Defendants | : | |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Now pending before me for report and recommendation are Plaintiffs' motion for

preliminary/permanent injunction and the Federal Defendants' motion to dismiss for lack of

subject matter jurisdiction and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6). See ECF Nos. 3, 13.[1]  At its crux, this case challenges an administrative action by the

United States Department of Housing and Urban Development ("HUD") in failing to object to

easements to permit future residents of an under-construction senior (ages 55 and older)

subsidized housing project to access and use the common areas and parking lot of an existing

elderly (ages 62 and older) subsidized housing project.  I recommend that the Court enter

judgment against Plaintiffs in favor of the Federal Defendants as to certain of their claims and

that the remaining claims and parties be dismissed.

**I.     INTRODUCTION**

---

[1] Also pending for report and recommendation is Plaintiffs' motion for partial summary judgment, ECF No. 20.  It is
addressed *infra*, n.27.

This case has been brought by three *pro se*[2] Plaintiffs, Nancy Newbury, Mark Hastings and Marcia Ducharme.  They are residents of West House ("WH I"), a Middletown, Rhode Island, affordable housing development for financially eligible elderly individuals (ages 62 and older) that is financed and subsidized pursuant to 12 U.S.C. § 1701q ("Section 202" of the National Housing Act of 1959).  See ECF No. 12.  Plaintiffs have sued HUD and several of its officials (collectively "the Federal Defendants")[3]; the non-profit sponsor of WH I, Church Community Housing Corp. ("CCHC"), and its executive director, Christian Belden (collectively "the Project Sponsor"); and a manager of WH I's property management company, John Byrne of Phoenix Property Management, Inc.  Id.

Plaintiffs' federal law claims against the Federal Defendant arise principally[4] pursuant to the Administrative Procedures Act ("APA"), which provides that a "person suffering legal wrong

---

[2] As *pro se* litigants, Plaintiffs have challenged the Court and Defendants.  By way of just two examples, Plaintiffs made repeated filings seeking to change/tweak their complaint and at, one point (after the Federal Defendants had responded to it), to amplify the pending motion for preliminary injunction by asking for a nationwide injunction on behalf of an unspecified class (the latter request was withdrawn).  These actions burdened the Court and resulted in the Court's repeated need to intervene to prevent prejudicial (to Defendants) confusion.  See, e.g., Text Orders of Apr. 8, June 12, June 28, 2024; see also Notice of June 27, 2024.  At one point, Plaintiffs conceded they had confused even themselves, for example asking the Court to determine their operative pleading (it is ECF No. 12, provided that more recently the Court has allowed the contract claim added by Plaintiffs' fourth motion to amend, ECF No. 31).  See ECF No. 21; Text Order of Aug. 20, 2024.  Nevertheless, as noted *infra* nn.4, 10, 12, 13, 18, 20, 21, 23, the Court has strived to afford Plaintiffs significant leniency by looking past these concerns to the merits of their arguments while maintaining an appropriate balance to avoid prejudice to Defendants.

[3] They are: Adrianne Todman, the current Acting Secretary of HUD (who has not yet been substituted as the correct defendant), formerly, Marcia Fudge, then Secretary of HUD; William Morales, HUD's Senior Account Executive of the Asset Management Division of the Regional Office in Boston, Massachusetts; and Peter Aser, HUD's Director of the Field Office in Providence, Rhode Island.  All are sued in their official capacities only.

[4] Plaintiffs' *pro se* complaint (ECF No. 12, as amended by ECF No. 31) states that they are proceeding pursuant to an array of federal statutes, regulations and the HUD Handbook and policies.  Mindful of its duty to afford Plaintiffs leniency, the Court has focused on the Administrative Procedures Act and the law related to housing in its explication of applicable law *infra*.  Plaintiffs have also cited 28 U.S.C. § 4101, which is inapplicable as it addresses whether a foreign judgment of defamation may be enforced in a federal court.  Similarly, Plaintiffs cite 42 U.S.C. § 3604 and advert to "sex discrimination in terms and conditions of housing" based solely on their unsworn representation that approximately 80% of the WH I residents are female, while some (but not all) of the HUD officials are male.  Because such facts (assuming them to be true) fall woefully short of supporting a claim of sex discrimination in housing, I have not struggled to understand and develop further Plaintiffs' allusion to sex discrimination.  See Rollins v. Hous. Auth. of Kan. City, No. 08-CV-0506-W-DGK, 2009 WL 10671774, at *4 (W.D. Mo. Mar. 2, 2009) (describing elements of gender discrimination claim under Fair Housing Act).  The claims based

because of agency action . . . is entitled to judicial review thereof," 5 U.S.C. § 702, provided that such judicial review should be afforded only for agency actions "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs focus on HUD's determination that program objectives of Section 202, HUD's security interest in WH I and the quiet enjoyment of the elderly residents of WH I (including Plaintiffs) will not be negatively affected by the Project Sponsor's plan for WH I to afford two easements for use of WH I common areas and parking lot by staff and residents of a new affordable senior housing residence (West House II, "WH II"), to be restricted to individuals aged 55 and over, being constructed on an underutilized portion of the WH I real estate. Declaration of Joseph Crisafulli,[5] ECF No. 13-15 ("HUD Dec.") ¶¶ 19, 27-40; see also id. Ex. 7. As clarified during the hearing before me, Plaintiffs do not object to WH II's construction and operation. They challenge only HUD's failure to object to the Ground Lease between WH I and WH II[6] to the limited extent that it contains two easements – (1) permitting staff and residents of WH II to use the common areas of WH I during "normal hours" and (2) permitting WH II to allow "approved

---

on 28 U.S.C. § 4101 and 42 U.S.C. § 3604 are addressed by my recommendation *infra* of dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs' vague and undeveloped allusion to "[f]ederal and [s]tate laws on Elder Abuse," ECF No. 12 at 5, is similarly recommended for Fed. R. Civ. P. 12(b)(6) dismissal.

[5] The Federal Defendants appropriately presented and rely on this sworn Declaration to support their opposition to Plaintiffs' motion for preliminary/permanent injunction. With no evidence-based factual dispute regarding the truthfulness of the averments in this Declaration, the Court has considered it as described in this report and recommendation.

[6] Defendant CCHC is the non-profit Project Sponsor of WH I, The West House Corporation is the non-profit owner of WH I, and West House II Realty L.P. is the owner of WH II. CCHC is described as the alter ego of the West House Corporation (e.g., HUD Dec. Ex. 6) (ECF No. 13-6), and as the sole shareholder of West House II Realty L.P. (Pl. Ex. 5; HUD Dec. Ex. 7 (ECF No.13-7)), while Plaintiffs refer to CCHC as the "owner" of WH I and the entity that conceived the proposal for WH II, e.g., ECF Nos. 3, 12. In the Ground Lease, WH I's owner is defined as the "Landlord" and WH II's owner is the "Tenant." HUD Dec. Ex. 7 (ECF No. 13-7). For simplicity, unless otherwise specified, I interchangeably refer to The West House Corporation and the WH I housing project as "WH I"; similarly, I refer to West House II Realty L.P. and the WH II housing project as "WH II."

users" to use the WH I parking lot and points of vehicular and pedestrian ingress and egress.  Pl. Ex. 5 ¶¶ 4.1-4.3; HUD Dec. Ex. 7 ¶¶ 4.1-4.3.

Citing the Supreme Court's recent decision in <u>Loper Bright Enterprises v. Raimondo</u>, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires"), and arguing that they were not afforded notice and an opportunity to provide comments as required by applicable law, Plaintiffs seek to enjoin, preliminarily and permanently,[7] these easements, as well as to stop the completion of the construction of a physical connector[8] between WH I and WH II to facilitate the access afforded by the easements.  In support of this extraordinary relief, citing 24 C.F.R. Pt. 245, Plaintiffs argue that HUD's failure to object transgressed the operative regulations, which require notice to Section 202 tenants before a partial release of mortgage security may be approved.  24 C.F.R. §§ 245.405(c), 245.410.  They further contend that HUD's failure to prevent implementation of the Ground Lease provisions that permit common area/parking lot intermingling of the WH II residents who will be 55 and older, with the WH I residents, who are

---

[7] At the hearing, and consistent with applicable law, Plaintiffs said they were not interested in damages arising from their federal law claims but simply want to preserve the status quo.  <u>See</u> 5 U.S.C. § 702 (right of review of agency action applies only to claims seeking relief other than money damages).  Also at the hearing and as clarified in their post-hearing filings, pursuant to Fed. R. Civ. P. 65(a)(2), Plaintiffs asked the Court to consolidate its decision on the preliminary injunction with a decision on the merits of their federal law claims against the Federal Defendants.  Because Plaintiffs' federal law claims seek only injunctive relief, I have acquiesced with their request.  Therefore, to the extent that I reach the merits of Plaintiffs' motion for an injunction, my recommendation *infra* is that the Court deny preliminary injunctive relief and enter final judgment denying permanent injunctive relief against Plaintiffs and in favor of the Federal Defendants.

[8] Plaintiffs' Exhibit 1 is a photograph that is alleged to depict this physical connector.  Because Plaintiffs did not seek to authenticate it as a full exhibit, it was admitted as a demonstrative to allow the Court to understand what Plaintiffs seek to enjoin.  Mindful of Plaintiffs' *pro se* status, I have considered Exhibit 1 as such.  Based on Exhibit 1, this connector is a short fully roofed/walled (with two large windows and what appears to be a doorway) hallway connecting the closely adjacent and similarly sized buildings – WH I and WH II – permitting persons to pass between WH I and WH II without going outdoors and being exposed to the elements.  As of the unknown date when this photograph was taken by an unspecified person, the construction of this connecting hallway was well along in that, for example, the foundation, roof, walls and windows were already in place, although the surrounding area appears to be an open construction area – with holes, dirt and protruding metal – that would likely be dangerous if an injunction required it simply to be left as is.

62 and older, is arbitrary and capricious in that HUD did not consider their concerns that such commingling will irreparably disrupt the peaceful enjoyment, safety and well-being of the elderly WH I residents.  In support of this contention, Plaintiffs argue (but offer only speculation and no factual evidence to establish) that the individuals who will be allowed to occupy the units in WH II and to enter the common areas and parking lot of WH I are likely to be younger mentally disabled persons, many of whom will be drug addicted, rowdy and disruptive.[9]  See Pls.' Mot. for Prelim. Inj., ECF No. 3 at 5-15.

In response, citing Spokeo v. Robins, 578 U.S. 330, 338 (2016) and Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), the Federal Defendants contend that Plaintiffs lack Article III standing because there is no causal connection between HUD's decision regarding the easements and Plaintiffs' speculation that their quiet enjoyment of their WH I units will be breached by inappropriate use of the WH I common areas/parking lot by WH II residents, as well as because, to the extent that such an injury hereafter may arise and is not redressed by WH I, Plaintiffs have an adequate remedy in state court for breach of the covenant of quiet enjoyment.

Regarding the merits of Plaintiffs' federal law claim, the Federal Defendants counter that the notice provisions in 24 C.F.R. §§ 245.405(c) and 245.410 do not apply because, despite the Project Sponsor's request, HUD did not approve a partial release of security and there has been no partial release of mortgage security.  Further, HUD's authenticated presentation to the Court, confirmed by Plaintiffs' exhibits and unauthenticated documents, establishes that there was pre-decisional notice of the Project Sponsor's intermingling plan to tenants, that tenants were afforded an opportunity to comment, that HUD was provided with copies of tenant comments,

---

[9] During the hearing, Plaintiffs amplified this *ipse dixit* argument by asserting, for example, that the WH II residents will engage in "all kinds" of "negative" incidents, such as "throw[ing] a beer can at an old lady who tells them to pull up their pants."

that HUD appropriately considered the tenant comments, including those from Plaintiffs, and that the Project Sponsor made adjustments to respond to tenant comments on which HUD relied in making its determination regarding the easements.  HUD has also presented evidence that amply demonstrates that, far from being arbitrary and capricious, HUD offered a satisfactory explanation for its factual analysis and resulting decision regarding the easements, that there is a rational connection between the facts found and the choice made, and that it did not ignore any important aspect of the matter.  <u>Ohio v. Env't Prot. Agency</u>, 144 S. Ct. 2040, 2053 (2024).

Regarding injury and harm from HUD's action, the Federal Defendants argue that Plaintiffs have factually failed to establish irreparable harm, or any harm, from the easements because the injury on which Plaintiffs rely is mere speculation based on their unfounded expectation that the persons who will be approved to reside in WH II will be mentally disabled, drug-addicted, rowdy and disruptive.  Relatedly, the Federal Defendants contend that the balance of the equities tip decisively against the issuance of the requested injunction and that the public interest would be profoundly and adversely impacted by an injunction that undermines and burdens the expansion of affordable housing in Rhode Island directly contrary to the purpose established by Congress when it adopted Section 202.  HUD Dec. ¶ 41.  The Project Sponsor echoes these arguments, and also contends that the harm from an injunction to it would be incalculable, as well as that the requested injunction would adversely and perhaps irreparably impact the proposed tenants for WH II and the community in that the community's need for WH II is urgent and eligible tenants are already being accepted from a wait list.

## II.    PROPOSED FINDINGS OF FACT[10]

_____

[10] Plaintiffs presented unsupported factual arguments and offered six exhibits at the hearing and one exhibit after the hearing; of these, four were admitted in evidence and one was allowed as a demonstrative.  They offered no sworn testimony regarding any factual matter before or during the hearing.  Prior to the hearing, they did offer various factual items for "judicial notice" unsupported by any foundational facts.  ECF No. 35 Exs. 1-7, 9-10, 13, 17.  Based

In 1996, the Project Sponsor, acting through WH I, applied for and received a capital advance from HUD for the Section 202 elderly housing project that became WH I. HUD Dec. ¶¶ 12-14. HUD as mortgagee and WH I as mortgagor executed a Capital Advance Mortgage, HUD Dec. Ex. 1 (ECF No. 13-1); HUD and WH I also executed a regulatory agreement and a use agreement, HUD Dec. Exs. 2-3 (ECF Nos. 13-2, 13-3); Pls. Ex. 3. In 1997, HUD and WH I executed a project rental assistance contract, HUD Dec. Ex. 4 (ECF No. 13-4). Plaintiffs allege, and I accept as true, that they are elderly residents of WH I. ECF No. 12 at 7.

On August 3, 2021, CCHC and WH I entered into a memorandum of understanding to study (with consultants) the feasibility of providing additional senior housing on the WH I site based on the finding that "the use of the entire parcel is not necessary for the current senior housing" and to address the area's "pressing need for affordable senior housing." HUD Dec. Ex. 5 (ECF No. 13-5 at 3-4). As described in the memorandum of understanding, the proposal for additional senior housing on the WH I parcel to be studied was not limited to financing through Section 202; as amplified in the HUD Declaration, WH II is not a Section 202 project. Rather, it is financed pursuant to a housing finance agency risk-sharing agreement between Rhode Island Housing and Mortgage Finance Corporation and HUD pursuant to 12 U.S.C. § 1709 and encumbered by state affordable housing restrictions. HUD Dec. ¶¶ 23-24.

On October 27, 2021, the WH I Property Manager (Phoenix) issued a notice to residents of WH I regarding a "Presentation on Proposed Expansion Project at West House" at a meeting to be held on November 4, 2021. HUD Dec. Ex. 13 (ECF No. 13-13 at 23). On November 4,

---

on this significant factual deficiency, Defendants asked the Court to simply deny the requested injunction based on the absence of evidence. While Defendants' argument is well founded, mindful of Plaintiffs' *pro se* status, I have not chosen that path. Rather, I have considered Plaintiffs' arguments and admitted exhibits, together with their "judicial notice" factual items, which I have assumed are authentic solely for purposes of this decision. See Text Order of Aug. 20, 2024. To avoid material prejudice to Defendants, to the extent that my proposed findings are not adopted, the Court should require that Plaintiffs must address this deficiency, particularly with respect to the "judicial notice" items, before proceeding further on their prayer for injunctive relief.

2021, the meeting was held; as described by Defendant Byrne in a November 19, 2021, letter written as "evidence of [CCHC]'s public engagement efforts," it lasted for one hour and was attended by thirty to thirty-five residents and six to eight neighbors.  Id. (ECF No. 13-13 at 24).  According to Defendant Byrne, CCHC explained that the project would "help address the town's need for senior affordable housing" and would use WH I's "excess, unused common area[s]." Id.  Among the concerns expressed by residents at the meeting as reported by Defendant Byrne was whether the demographics of WH I would change and whether "non-seniors would be able to move into the new building"; CCHC through Defendant Belden "guaranteed that any new housing would only be seniors, just like the existing West House."  Id.  A February 1, 2022, letter to the Middletown Planning Board written by unspecified residents of WH I (with Plaintiff Newbury listed as "[c]ontact [p]erson"), concedes that the notice of this meeting issued and that the meeting occurred, but describes it as "a perfunctory one-hour meeting," and alleges that "residents were given no opportunity to express their concerns."  Id. (ECF No. 13-13 at 51).  I find that the latter claim is unfounded in that, as described in Defendant Byrnes' contemporaneous letter, the tenants did express the same intermingling concern that Plaintiffs now allege HUD failed properly to consider.

Four days after this meeting with tenants, on November 8, 2021, CCHC wrote to the Providence Field Office of HUD advising that it was initiating the process of developing new senior affordable housing and was making an "[i]nitial [s]ubmission" in support of a request for approval of a "Partial Release of Security."  HUD Dec. Ex. 5 (ECF No. 13-5 at 1).  This letter advises HUD that the "new project will be completely compatible with the existing use, and will serve to enhance the existing residential character of the community through additional residents in lieu of a large unneeded parking area," as well as that "[r]esidents of the new project will be

granted access to the underutilized common-use facilities in the existing building." Id. (ECF No. 13-5 at 2). This letter asserts that "[n]otice to tenants is not required in this case because this is a 202 with a capital advance and has Project Rental Assistance Contracts (PRAC) for all units."[11] Id. However, the letter also advises HUD that a "voluntary notice, an invitation to a meeting to learn about, and provide feedback on, the project was distributed to tenants [and that t]he meeting took place on November 4th." Id.

Between this initial submission to HUD and the Project Sponsor's formal request for HUD's approval of a partial release of security sent on March 24, 2022, the WH II proposal was discussed at a second meeting of WH I residents (on February 16, 2022); the plan was considered by Rhode Island Housing, by the state legislators for Middletown and environs, and by the Middletown Planning Board. See HUD Dec. Exs. 6, 8, 10, 11, 13 (ECF No. 13-13 at 1, 18-21), 14. Resident concerns about the adequacy of parking and the intermingling of the WH I elderly with younger persons from WH II in the WH I parking lot and common rooms were vehemently expressed to the Middletown Planning Board, for example, in the letter from "residents" dated February 1, 2022. HUD Dec. Ex. 13 (ECF No. 13-13 at 51). The Middletown Planning Board also received from Plaintiff Newbury and considered a study from Connecticut[12] regarding

---

[11] This assertion by the Project Sponsor that notice to tenants would not be required appears to be based on the HUD Handbook, as placed in evidence by Plaintiffs. Pls. Ex. 7. In relevant part, for partial release of security, the Handbook states: "[n]otice to tenants is not required for projects with . . . capital advances under Section[] 202 . . . which [has] . . . Project Rental Assistance Contracts (PRAC) for all units." Id. § 16-4(b)(4). According to the evidence before the Court, WH I is a Section 202 "Capital Advance Program," and has a Project Rental Assistance Contract. HUD Dec. Exs. 1-4. However, as Loper Bright holds, HUD's creation of an exception to the notice requirement for partial release of security in the Handbook cannot override the operative statute mandating notice. See 12 U.S.C. § 1715z-1b.

[12] Plaintiffs include an unauthenticated partial copy of what the Court assumes must be this Connecticut study (listed as State of Connecticut Investigation Report) with their "judicial notice" motion. ECF No. 35-17. Having reviewed the version attached to that motion, were it to be assumed to be authenticated as such, I would find that what has been submitted does not support Plaintiffs' contention that mixing of 55 and older individuals with 62 and older individuals will cause irreparable harm to the latter group in that the report recommends that concerns from mixing of elderly persons with young mentally disabled persons should be addressed by education to prevent stereotyping mental illness, better guidelines for tenant selection, suitability and eviction, and better service

mixing generations in affordable housing.  HUD Dec. Ex. 13 (ECF No. 13-13 at 32-33).  Based

on these resident concerns, several changes were made to the plan for WH II.  As relevant here,

with the consent of the Project Sponsor, the number of parking spaces was increased and the

concern about intermingling of elderly with younger persons was specifically addressed by the

Middletown Planning Board, which set as a condition of its approval that the "[s]ubject

development shall be restricted to allowing only persons aged 55 or older to reside in units

approved as part of this application."  HUD Dec. Ex. 8 (ECF No. 13-8 at 2).  The elected local

legislators expressed support for WH II *inter alia* because "[a]ffordable housing is one of

Middletown's most pressing issues, especially for seniors."  HUD Dec. Ex. 11 (ECF No. 13-11);

HUD Dec. Ex. 10 (ECF No. 13-10) ("Middletown desperately needs affordable housing . . . .

This is very important for our seniors . . . [and] align[s] with Middletown Comprehensive Plan's

housing goals" by converting "underdeveloped properties into affordable housing").  The

Planning Board approval issued on March 14, 2022.  HUD Dec. Ex. 8 (ECF No. 13-8).

     With the Middletown Planning Board approval, on March 24, 2022, the Project Sponsor

sent its formal written request to HUD for approval of a "Partial Release of Security."  HUD

Dec. Ex. 6 (ECF No. 13-6 at 1).  As with the initial submission, the Project Sponsor asserted that

notice to tenants was not required but advised HUD that notice to tenants had been done

voluntarily and that some concerns had already been addressed while CCHC and its property

manager were continuing to work on others, including the resident concern about the ability of

the owner to restrict WH II to persons 55 and older.  Id. at 2-3.

---

coordination; the report makes no recommendation that such mixing be prohibited.  See id. at 35, 40, 44-46, 51.
However, that is beside the point.  What matters is that, to the extent that Plaintiffs' concerns were based on the
Connecticut study, these concerns were fully considered by the Middletown Planning Board and subsequently by
HUD.  On that basis, and mindful of Plaintiffs' *pro se* status, I have considered this portion of the State of
Connecticut Investigation Report, as Plaintiffs requested in the "judicial notice" motion.

At the end of March 2022, forty-four residents of WH I apparently signed pre-printed statements supporting the plan for WH II, except that they opposed that WH II residents could have access keys to WH I.[13]  During April 2022, Plaintiff Newbury continued to raise resident concerns with representatives from the town of Middletown.[14]  On April 13, 2022, the Project Sponsor addressed Plaintiffs' concerns in a letter addressed to Plaintiff Newbury that focused on the adequacy of parking and the intermingling of elderly and younger populations.  HUD Dec. Ex. 13 (ECF No. 13-13 at 40-44).  The letter notes that the number of parking spaces had been increased and the Planning Board imposed a limit (55 and older) for any resident of WH II in response to her concerns.  Id.

On January 3, 2023, Plaintiffs Newbury and Hastings turned their attention to HUD, writing an eight-page single-spaced letter that aggressively contends that the Project Sponsor's plan for WH II will jeopardize the safety of the residents of WH I and their peaceful enjoyment of WH I due to inadequate parking and the intermingling of the elderly with a younger and potentially mentally disabled population in the WH I common areas.  HUD Dec. ¶ 36 & Ex. 12 (ECF No. 13-12); see ECF No. 13-12 at 5 ("And many of whom could be seriously mentally

---

[13] These documents were submitted to the Court by Plaintiffs attached as Item 10 to their "judicial notice" motion. ECF No. 35-10.  Mindful of Plaintiffs' *pro se* status, for purposes of the motion for injunctive relief, the Court assumes these forms were signed by WH I residents on the dates they bear although Plaintiffs did not authenticate them or explain the circumstances under which they were procured.  I have considered these documents to the extent that, as of late March 2022, they confirm that WH I tenants had had notice of and an opportunity to comment on the intermingling aspect of the WH II proposal.

[14] During this period, Plaintiff Newbury accused the Middletown Planning Board of "unlawful quid pro quo practice" and "unlawful collusion," an intentional wetlands violation, and restated her claim that WH II residents would be young and dangerous, imperiling the safety of the WH I elderly.  HUD Dec. Ex. 13 (ECF No. 13-13 at 33). In response to the first concern, the Town Planner submitted a written defense of his committee's conduct to the Town Administrator.  Id. (ECF No. 13-13 at 31).  In response to the second concern, engineers quickly confirmed that no wetlands were implicated.  Id. (ECF No. 13-13 at 31, 34-36).  In response to the third concern, the Planning Board confirmed to the Town Administrator that it had already "imposed as a condition of its Preliminary Plan approval that only residents 55 years and older are permitted."  Id. (ECF No. 13-13 at 32).

disabled.  The goal is to stop the madness before it puts seniors at great risk.").[15]  This letter (as I find *supra*) inaccurately advised HUD that the Project Sponsor had "no meeting or discussion of any kind" before gaining final approval from the Town and that "[t]own officials . . . elected not to get involved."  ECF No. 13-2 at 2.  Plaintiffs Newbury and Hastings asked HUD to give "priority" to their complaint.  Id. at 8.

HUD quickly responded to Plaintiffs' letter.  On January 24, 2023, it submitted Plaintiffs' concerns to the Project Sponsor and asked it to respond.[16]  HUD Dec. ¶ 37.  The result is HUD Exhibit 13, a fifty-five-page compendium of materials submitted to HUD by the Project Sponsor on February 1, 2023, which reflect WH I residents' (including Plaintiffs') concerns and the Project Sponsor's responses to those concerns, particularly focused on the claims related to parking and intermingling of age groups.[17]  At the same time, the Project Sponsor provided HUD with age demographic information about the persons on the wait list for WH II, confirming that they are all at least 62 and older (with most between 70 and 75), and advised HUD that it was

---

[15] Plaintiffs expanded on this theme in their written communications to HUD: "[n]egative incidents to be expected when an elderly population is mixed together with a younger mentally disabled population can include inappropriate social behavior, criminal activity, physical or verbal altercations, illegal drug use, disruptive guests, profanity, public intoxication, fire, panhandling, excessive noise, or destruction/theft of property."  ECF No. 13-12 at 6.

[16] In Plaintiffs' post-hearings submissions, they argue that an evidentiary hearing should have been ordered *sua sponte* by the Court for HUD officials to explain why they relied on the Project Sponsor's "assurances" that tenant notice and an opportunity to respond were not required.  ECF No. 46.  The Court has considered this argument as reflected in the Text Order of Aug. 20, 2024.  Factually, as stated in the text, I find that the undisputed evidence establishes that HUD officials did not rely on the Project Sponsor's statement (from the Handbook) that tenant notice was not required.  That is, while the Project Sponsor did state its view that tenant notice was not required, HUD did not accept that perspective, but instead required the Project Sponsor to respond to tenant comments and relied on the Project Sponsor's having provided "voluntary" tenant notice and having afforded an opportunity to comment in assessing the proposed easements.  See HUD Dec. ¶¶ 21, 28-30, 38.

[17] In the Project Sponsor's response, Defendant Belden made certain statements that Plaintiffs interpret as an *ad hominem* attack on them.  HUD Dec. Ex. 13 (ECF No. 13-13 at 1).  These statements appear to be part of the basis for Plaintiffs' state law defamation claims.  What is relevant to the federal law/APA claim is that there is no evidence that either the Middletown Planning Board or HUD considered these allegedly defamatory statements.  Specifically, I find that both the Middletown Planning Board and HUD took Plaintiffs' concerns about intermingling very seriously and appropriately relied on the adjustments made to address them before making any decision regarding the Project Sponsor's plan.  I further find that there is no evidence to suggest that HUD's decision regarding the easements was based in any respect on these statements.

planning to further address Plaintiffs' concerns by adding an alarmed crash bar locking system so that WH II access to WH I could be restricted in the future if necessary.  Id. (ECF No. 13-13 at 7, 15, 46-48).  Among the unauthenticated materials submitted by Plaintiffs with their "judicial notice" motion are additional letters from Plaintiffs Newbury and Hastings to HUD in March, May, July and October 2023, reiterating their concerns about parking and that the intermingling of 55-year-olds with much older WH I residents will cause irreversible damage to the peaceful enjoyment by WH I residents in reliance on the Connecticut study.  ECF Nos. 35-2, 35-3, 35-4, 35-5.

On August 22, 2023, the Project Sponsor acting through WH I presented to HUD its written confirmation and certification that the easements proposed for the Ground Lease by which WH I would afford access to WH II staff and residents for use of common rooms during restricted hours and access to the WH I parking lot for authorized users "will not negatively affect the quiet enjoyment of tenants of [WH I]."  HUD Dec. Ex. 9 (ECF No. 13-9).  Two days later the Ground Lease between WH I as landlord and WH II as tenant was executed.  HUD Dec. Ex. 7 (ECF No.13-7); Pl. Ex. 5.  As described in the Ground Lease, WH I and WH II, when completed, will be of approximately the same size in that WH I has fifty units and many common rooms, while WH II will have fifty-four units and fewer common rooms.  Id. Paragraphs 4.1 and 4.2 of the Ground Lease contain the easements that Plaintiffs seek to enjoin. Id.

Despite the Project Sponsor's request for partial release of security, HUD's decisional process focused on the easements in the Ground Lease.  HUD Dec. ¶ 27.  Conducted by the Asset Management Division Director[18] responsible for privately-owned multifamily projects to

---

[18] In their motion for partial summary judgment (ECF No. 20) and at the hearing, Plaintiffs argue that the Court should issue the injunction and substitute its own findings of fact for those of HUD because the Asset Management

ensure that they meet the fundamental objective of providing affordable decent safe and sanitary housing to qualifying residents, HUD Dec. ¶ 2, HUD considered the purposes established by Congress for Section 202 (to expand the supply of affordable housing with supportive services for the elderly), as well as the restrictions in the regulatory agreement (HUD Dec. Ex. 2 ¶ 7(a)), which provides that the owner of property subject to a Section 202 mortgage cannot encumber the property by granting easements without obtaining HUD's approval.  HUD Dec. ¶¶ 6, 17.

Regarding the merits of the Project Sponsor's request, HUD's Declaration establishes, and I find, that HUD found that the proposal would expand affordable housing for older persons, which is a long-standing challenge in both this region and the country, as well as that the eligible occupants of WH II would not vary greatly from those of WH I.  HUD Dec. ¶¶ 19-20, 41.  HUD further considered that notice to tenants had been given, that two meetings had been conducted with WH I residents, that tenant comments had been received and that accommodations had been made in response to such comments, including that the number of parking spaces had been increased, Middletown Planning Board had unanimously approved the WH II plan as "consistent with local needs," with the proviso that no one younger than 55 would be permitted to live at

---

Division Director is not the correct decision maker.  Plaintiffs contend that the correct decision maker is the "[o]ffice of [e]lderly and [a]ssisted [h]ousing" based on a reference in the HUD Handbook to it as a HUD office authorized to address negotiated partial release of security requests that are directed to "[h]eadquarters."  See Pl. Ex. 7 at § 16-3(a)(1)(b); ECF No. 20 at 3-4.  There are three problems with this argument.  First, the averments in the HUD Declaration provide competent evidence that the Asset Management Division Director is the HUD official who is delegated the responsibility to oversee management of HUD-assisted multifamily housing projects in New England.  HUD Dec. ¶¶ 1-2.  Second, while the HUD Handbook does mention an "[o]ffice of [e]lderly and [a]ssisted housing," it also provides that "Field Office Authorization" may be permissible in certain circumstances and, in that event, (consistent with the HUD Declaration) the authority is delegated to the "Director of Housing Management."  Pl. Ex. 7 §§ 16-3(a)(1)(b) & 16-3(a)(2).  And third, in this case, HUD did not authorize a partial release of security so this provision of the Handbook is not implicated.  These conclusions are confirmed by Plaintiffs' submissions, which make clear that they directed their comments and concerns to the Asset Management Division Director's office, as well as to the Rhode Island Field Office, the Boston Regional Office and even directly to the HUD Secretary, but never to an office of elderly and assisted housing.  See, e.g., ECF No. 35-2.  At the hearing, HUD represented through counsel that the office of elderly and assisted housing no longer exists.  At bottom, with no evidence that a decisional process conducted by an "office of elderly and assisted housing" would have resulted in a different outcome, Plaintiffs lack standing to assert this argument.  DeSuze v. Carson, 442 F. Supp. 3d 528, 539-40 (E.D.N.Y. 2020), aff'd sub nom. DeSuze v. Ammon, 990 F.3d 264 (2d Cir. 2021).

WH II, and that a security device would be installed to restrict WH II access if necessary.  HUD Dec. ¶¶ 21, 28-30, 38; see also HUD Dec. Ex. 8 (ECF No. 13-8).  HUD further considered that elected officials offered unequivocal support for WH II.  HUD Dec. ¶¶ 34-35.  And HUD specifically considered the extensive comments and information submitted by Plaintiffs Newbury and Hastings.  HUD Dec. ¶¶ 36-39.  Weighing these considerations, HUD factually found that the easements would not negatively affect the quiet enjoyment of WH I residents, would not adversely affect HUD's security interest, and would not otherwise be in discord with Section 202 program objectives.  HUD Dec. ¶ 27.  HUD further found that the use of WH I common areas by residents of WH II is a means to expand a senior community and brings supportive services more efficiently and effectively to residents of both WH I and WH II, as well as that to prevent the proposed shared use would thwart rather than support the purposes of Section 202.  HUD Dec. ¶ 41.  Therefore, HUD determined that it had no objection to the easements in the Ground Lease.  HUD Dec. ¶ 40.

There is no evidence that HUD implemented a final agency action by issuing written approval of the Project Sponsor's request for a partial release of security.  Through its counsel at the hearing, HUD confirmed that there has been no partial release of security; Plaintiffs presented nothing to rebut this representation.  That is, despite the Project Sponsor's request, HUD did not approve a partial release of security; rather, it appropriately considered and determined that it had no objection to the easements.  As clarified at the hearing before me, construction of WH II including the connecting hallway is well underway, but not yet completed.  Also during the hearing, the Project Sponsor represented through counsel that it has invested substantial funds in the project (which is confirmed by the evidence), that it would seek a bond if

an injunction issues and that an injunction would impact the seniors on the wait list whom it is considering as potential tenants.

## III.    APPLICABLE LAW

### A.    <u>Administrative Procedures Act</u>

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," and waives the government's sovereign immunity in actions for relief "other than money damages" against officials acting in their official capacity.  5 U.S.C. § 702; <u>see</u> <u>William v. Devos</u>, Civil No. 16-11949-LTS, 2018 WL 5281741, at *9 n.15 (D. Mass. Oct. 24, 2018) (waiver of sovereign immunity).  The cause of action provided under the APA applies to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  <u>Id.</u> § 704.  The APA's "generous review provisions must be given a hospitable interpretation."  <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 141 (1967), <u>overruled on other grounds</u>, <u>Califano v. Sanders</u>, 430 U.S. 99 (1977).  The APA's waiver of immunity does not extend to cases where: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).  These exceptions are to be construed narrowly in light of the APA's strong presumption in favor of judicial review.  <u>DeSuze v. Carson</u>, 442 F. Supp. 3d 528, 540 (E.D.N.Y. 2020), <u>aff'd sub nom.</u> <u>DeSuze v. Ammon</u>, 990 F.3d 264 (2d Cir. 2021).

As recently confirmed by the Supreme Court, Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."  <u>Loper Bright</u>, 144 S. Ct. at 2261 (internal quotation marks omitted).  Thus, the APA delineates the basic contours of judicial review of agency action: "[t]o

the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.  Specifically, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." Id. § 706(2)(A).  At the same time, the APA mandates that judicial review of agency policymaking and factfinding must be deferential.  See id. §§ 706(2)(A) (agency action to be set aside if "arbitrary, capricious, [or] an abuse of discretion"); 706(2)(E) (agency factfinding in formal proceedings to be set aside if "unsupported by substantial evidence").

An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained"; while a court may not "substitute its judgment for that of the agency," the court "must ensure, among other things, that the agency has offered a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." Ohio, 144 S. Ct. at 2053 (internal quotation marks omitted); see Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (agency action is arbitrary and capricious when agency relied on improper factors, failed to consider pertinent aspects of a problem, offered rationale contradicting evidence, or reached a conclusion so implausible that it cannot be attributed to difference of opinion or application of agency expertise).  While the agency cannot simply ignore an important aspect of a problem, Ohio, 144 S. Ct. at 2053, the Court "may not substitute [its] judgment for that of the agency, even if [it] disagree[s] with its [factual] conclusions." Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (internal quotation marks omitted).

**B.**     **Housing Act of 1959**

Congress adopted Section 202, the Housing Act of 1959, to "enable elderly persons [aged 62 and older] to live with dignity and independence by expanding the supply of supportive housing."  12 U.S.C. §§ 1701q(a), 1701q(k)(1); see City of Bos. v. Harris, 619 F.2d 87, 89 (1st Cir. 1980) (per curiam) (§ 1701q known as Section 202 or Housing Act of 1959).  Congress specifically authorized HUD as the agency to provide assistance to private non-profit organizations (like the Project Sponsor in this case) to expand the supply of supportive housing through, *inter alia*, capital advances to finance such housing with the limitation that "[a]ll units in [such] housing . . . shall be made available for occupancy by very low-income elderly persons."  Id. §§ 1701q(c)(1), (d)(1).  Section 202 defines "elderly persons" as a household composed of one or more persons at least one of whom is aged 62 or more at the time of initial occupancy.  Id. § 1701q(k)(1).  Section 202 capital advances are secured by a mortgage between the non-profit owner as mortgagor and HUD as mortgagee and do not need to be repaid for forty years as long as the owner complies with program requirements.  See generally id. §§ 1701q(c)-(d).  To further enhance affordability of such projects, HUD provides monthly project rental assistance to owners through project rental assistance contracts.  Id. § 1701q(c)(2).

The implementing regulations for this program are at 24 C.F.R. Pt. 891.  To participate in a Section 202 program, a private non-profit sponsor must organize an entity to own the project.  24 C.F.R. §§ 891.200, 891.205.  The owner must execute and be bound by a HUD capital advance program mortgage, a regulatory agreement and a use agreement in a form to be prescribed by HUD.  24 C.F.R. § 891.170(a).  As applicable in this case, the HUD regulatory agreement and the use agreement prohibit the owner from encumbering or otherwise leasing, transferring or disposing of the project without the written approval of HUD.  See HUD Dec. Exs. 2, 3.

Relatedly, known as "Section 811," Congress created a similar program to expand the supply of supportive housing for persons with disabilities without regard to age.  42 U.S.C. § 8013(a); Blue Angel Realty, Inc. v. United States, 20 Civ. 8220 (KPF), 2022 WL 94599, at *2 (S.D.N.Y. Jan. 8, 2022).  Congress further specified in 42 U.S.C. § 1437e that a public housing agency may provide housing projects that can be designated for mixed population occupancy by both elderly and disabled families, as well as that a public housing agency may permit "near-elderly families" to occupy dwelling units if there are an insufficient number of elderly families to fill all units in a project.  42 U.S.C. §§ 1437e(a)(1), (3).  In the Housing for Older Persons Act, Congress clarified that housing for "older persons," defined as persons who are 55 and older, are exempt from claims based on familial status discrimination as long as, for example, age verification is appropriately conducted.  See 24 C.F.R. §§ 100.304-100.308; see generally Fair Hous. Council of Or. v. Brookside Village Owners Ass'n, No. 3:08-cv-3127-ST, 2012 WL 8017842, at *17-18 (D. Or. Oct. 19, 2012), adopted, 2013 WL 1914378 (D. Or. May 8, 2013).

Apart from claims based on the APA, it is clear that these statutes and the related regulations do not create a private right of action for subsidized housing tenants to proceed against HUD.  See, e.g., Lewis v. Wheatley, 528 F. App'x 466, 467-68 (6th Cir. 2013); Thompson v. Milennia Hous. Mgmt., No. 3:22-CV-267-KAC-JEM, 2023 WL 2564347, at *5 (E.D. Tenn. Mar. 3, 2023) ("[N]either the statutes governing HUD nor the regulations HUD promulgates provide individual tenants a right to sue."), adopted, 2023 WL 2562874 (E.D. Tenn. Mar. 17, 2023); Taylor v. Nat'l Invs., Ltd., C.A. No. 17-117 WES, 2022 WL 306367, at *8 (D.R.I. Feb. 2, 2022) (court joins many others in holding that "[t]here exists no implied right of action under Section 1437f of the Housing Act"); Platsky v. Lazar, 15 Civ 2454 (PAC) (FM), 2016 WL 127590, at *1 (S.D.N.Y. Jan. 11, 2016) ("Section 202 of the Housing Act of 1959 does

not create an implied private right of action to enforce regulations promulgated under the Act."),

appeal dismissed, No. 16-342 (2d Cir. Apr. 19, 2016).

C.    **Congressional Requirement of Notice to Tenants for Listed Actions**

One provision of federal housing law that applies to Section 202 projects establishes as a

purpose the "importance and benefits of cooperation and participation of tenants in creating a

suitable living environment in multifamily housing projects and in contributing to the successful

operation of such projects, including their good physical condition, proper maintenance, security,

energy efficiency, and control of operating costs."  12 U.S.C. § 1715z-1b(a).[19]  To implement this

purpose, Congress mandated that, whenever HUD's "written approval is required with respect to

an owner's request" for a specified list of actions, such as a rent increase, a conversion of rental

units to commercial use and/or a "partial release of security," the tenants must have "adequate

notice of, reasonable access to relevant information about, and an opportunity to comment on

such actions." Id. § 1715z-1b(b)(1).  Further, HUD is required to take the tenant comments into

consideration in approving one of the listed actions.  Id.  HUD's regulations implementing the

tenant notice requirement are found at 24 C.F.R. Pt. 245.  In particular, the regulations regarding

notice prior to HUD's approval of partial release of security are found at 24 C.F.R. §§ 245.15,

245.405(c), 245.410, 245.418.  These regulations require, *inter alia*, that the "mortgagor"

seeking approval of the partial release of security give notice to tenants, review the tenant

comments, prepare an evaluation of the comments and submit the information to HUD along

with its written request, and that HUD must consider them.  24 C.F.R. §§  245.425, 245.430.  If

---

[19] Plaintiffs did not cite to or rely on 12 U.S.C. § 1715z-1b.  Yet as developed in this decision, I find that it is the provision of law that potentially supports their claim.  Mindful of Plaintiffs' *pro se* status, I have not relied on waiver, but have considered whether § 1715z-1b supports their claim, finding that it does not because HUD complied with the § 1701z-1b requirements, as discussed *infra.*

HUD decides to approve the mortgagor's request for one of the listed actions, the mortgagor must notify the tenants of the HUD decision.  24 C.F.R. § 245.430.

As with other HUD regulations, it is well settled that these regulations, in themselves, do not give rise to a private right of action to enforce them.  Simmler v. Simmons, Case No. 2:18-cv-00981-DAK-JCB, 2020 WL 5947938, at *3 (D. Utah Sept. 4, 2020) (listing circuit courts that have unequivocally determined that there is no private right of action to enforce HUD regulations), adopted, 2020 WL 5810574 (D. Utah Sept. 30, 2020); Dan-Harry v. PNC Bank, N.A., C.A. No. 17-136 WES, 2018 WL 1083581, at *3 (D.R.I. Feb. 27, 2018) (no private right of action exists under HUD regulations).  Nevertheless, as held in DeSuze, 442 F. Supp. 3d 528, subsidized housing tenants may bring an APA claim for judicial review of an alleged denial of the procedural rights mandated by 12 U.S.C. § 1715z-1b.  Id. at 540-41.  DeSuze finds that the existence of alternative adequate remedies to redress the injury caused by the action taken without compliance with § 1715z-1b is beside the point – there can be no "adequate" alternative remedy to redress HUD's failure to follow notice requirements mandated by Congress.  Id. Thus, a failure to provide notice to tenants falls within the APA's explicit requirement that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be [, inter alia,] without observance of procedure required by law."  5 U.S.C. § 706(2)(D); see Loper Bright, 144 S. Ct. at 2261.

Nevertheless, DeSuze also holds that an APA claim based on breach of the basic requirements set by Congress in § 1715z-1b does not translate to a claim for breach of the more complex and technical notice provisions in the HUD regulations and HUD publications/guidance because tenants lack standing to establish the necessary injury.  DeSuze, 442 F. Supp. 3d at 539-40 (tenants are not harmed by technical noncompliance with regulation and HUD guidance).

Thus, § 1715z-1b is satisfied as long as notice is given to tenants, who have an opportunity to comment, and HUD takes their comments into consideration.  DeSuze, 990 F.3d at 269 (where tenant written comments were forwarded to and considered by HUD, tenants cannot complain that precise procedures in HUD Notice H 00-8 or 24 C.F.R. § 245.330 were not followed); see Hud Tenants Coal. v. U.S. Dep't of Hous. & Urb. Dev., 274 F. App'x 124, 127 (3d Cir. 2008) (where complaint itself references discussion of rent-increase and reveals that tenant received HUD consideration to which he was entitled, APA claim based on breach of § 1715z-1b was appropriately dismissed); Dean v. Martinez, 336 F. Supp. 2d 477, 483-84 (D. Md. 2004) (HUD's only § 1715z-1b obligation is to take tenant comments "into consideration"; when undisputed evidence indicates that HUD discharged this responsibility, judgment on APA claim entered in favor of HUD).

### D.    HUD Handbook[20]

In addition to the regulations, Plaintiffs have asked the Court to consider an excerpt – Chapter 16, Section 1 (Partial Release of Security) – from a document referred to as the HUD Handbook.  Ex. 7 (which includes Ex. 2).[21]  A specific page from this section of the Handbook – ¶ 16-13 – is referenced in the HUD Declaration as the internal HUD guidance (together with the regulatory agreement, Pl. Ex. 3, HUD Dec. Ex. 2) that sets out the framework for HUD's review

---

[20] The relevant portions of the HUD Handbook are in evidence as Exhibits 2 and 7.  The Department of Housing and Urban Development, Multifamily Asset Management and Project Servicing (4350.1) Handbook may be found at https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4350.1.

[21] Exhibit 7 was offered in evidence by Plaintiffs at the hearing.  Having not had an opportunity to review it in advance of the hearing, the other parties agreed that it could be admitted and considered as a copy of Chapter 16 of the Handbook as long as it turned out to be an authentic copy.  After the hearing, Plaintiffs offered Exhibit 2, a page from Exhibit 7, which the Court received on the same basis.  Text Order of June 27, 2024.  Having received no notification from any party that Exhibits 2 and 7 are not authentic copies of portions of the Handbook, they are both now admitted as full exhibits.

of an owner proposal to grant an easement.  HUD Dec. ¶ 27.  Plaintiffs offered the same

Handbook provision post-hearing; it is admitted as Exhibit 2.  As relevant here, it provides:

> EASEMENTS.
>
> a.    On occasion, owners are requested . . . to grant easements . . . for construction of sewer or power lines, or for other purposes.
>
> b.    Easements are not partial releases of security.
>
> . . . .
>
> d.    The owner shall provide the Director of Housing Management with a copy of all executed documents.
>
> e.    Field Office Manager must determine and certify that the proposed easement will not negatively affect the quiet enjoyment of tenants.

Dept. of Hous. & Urb. Dev., Multifamily Asset Mgmt. and Project Servicing (4350.1) Handbook,

Chapter 16 § 16-13.  Thus, as the HUD Declaration avers, HUD may approve an easement

requested by an owner unless it determines that the easement would negatively affect the quiet

enjoyment of tenants of the project, adversely affect HUD's security interest, or otherwise not be

in accordance with the Section 202 program objectives.  HUD Dec. ¶ 27.

It is long established that this Handbook "is not mandatory"; thus, "it is clear no [tenant]

private cause of action could be implied from it."  Harrison v. Hous. Auth. of City of Coll. Park,

445 F. Supp. 356, 358-59 (N.D. Ga. 1978) ("precatory nature of HUD handbooks obviates

arguments that they could give rise to a claim of entitlement"), aff'd, 592 F.2d 281 (5th Cir.

1979); see Pierre v. NFG Housing Partners LP, No. 2:21-CV-00300-GZS, 2021 WL 5500489, at

*4 (D. Me. Nov. 22, 2021) (HUD handbooks unenforceable as a matter of law), adopted, 2021

WL 5999300 (D. Me. Dec. 20, 2021); Paulk v. Ga. Dep't of Transp., CV 516-19, 2016 WL

3023318, at *12 (S.D. Ga. May 24, 2016) ("[T]here is no express or implied statutory private

right of action for HUD violations" and therefore no private right of action to enforce HUD

Guidebook requirements) (internal quotation marks omitted).

### E.    <u>HUD Contracts</u>

Plaintiffs have argued that the Court should focus on the 1996 agreements [the capital

advance mortgage, the regulatory agreement and the use agreement] between the Project

Sponsor, through its WH I affiliate, and HUD (HUD Dec. Exs. 1-3, Pl. Ex. 3), and treat them as

third-party beneficiaries with a contractual right to enforce them.[22]  Plaintiffs have failed to

specify what contractual provision of these agreements they allege has been breached resulting in

injury to them.[23]  Plaintiffs' only legal support for the proposition that they can maintain a

contractual claim is an unauthenticated, blank and undated document (Pls. Ex. 6), seemingly a

form "use agreement," that Plaintiffs informed the Court they "probably" found on the internet;

in light of Defendants' objection to the document and Plaintiffs' concession that they know

nothing of its provenance, it was not admitted in evidence and I have not relied on it.

The law in this Circuit is clear: Section 202 tenants do not have a contractual right to sue

HUD officials as third-party beneficiaries of any of the contracts between HUD and the non-

profit that owns/sponsors the elderly housing project.  <u>Falzarano v. United States</u>, 607 F.2d 506,

511 (1st Cir. 1979); <u>Feldman v. U. S. Dept. of Hous. & Urb. Dev.</u>, 430 F. Supp. 1324, 1328 (E.D.

Pa. 1977).  The law is also clear that, to the extent Plaintiffs are found to have a viable contract

claim against the Federal Defendants, such a claim must be brought pursuant to the Tucker Act,

---

[22] A contractual cause of action was missing from Plaintiffs' operative complaint (ECF No. 12) but is introduced by the fourth amendment (ECF No. 31).  Applying *pro se* leniency, I granted the fourth motion to amend and have considered Plaintiffs' contractual arguments.

[23] For example, the regulatory agreement provides that only elderly families (defined as a family with at least one member who is at least 62, with other members who may be under 62) and elderly individuals may occupy the dwelling accommodations in WH I.  HUD Dec. Ex. 2 ¶¶ 7(g), 12(a).  However, this language limits who may occupy the WH I dwelling units; it is not breached by the easements, which afford access only to the common areas and the parking lot.

which Plaintiffs have not pled, and Plaintiffs must demonstrate privity of contract with the United States, which they cannot do. First Mortg. Corp. v. United States, 142 Fed. Cl. 164, 170 (2019), aff'd, 961 F.3d 1331 (Fed. Cir. 2020).

## IV. STANDARD OF REVIEW

### A. Injunctive Relief

When considering a request for injunctive relief, the court must be guided by the traditional equity doctrine that such relief is an extraordinary and drastic remedy that is never awarded as of right. Schnitzer Steel Indus., Inc. v. Dingman, 639 F. Supp. 3d 222, 226 (D.R.I. 2022); Letourneau v. Aul, C.A. No. 14-421L, 2015 WL 5167854, at *2 (D.R.I. Sept. 3, 2015). The basic four-factor legal standard requires the Court to find that the moving party has demonstrated: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) that the injunction is in the public interest. Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 42 (1st Cir. 2024). Where the federal government is a party, the equities and public interest inquiries tend to merge. Mass. Fair Hous. Ctr. v. U.S. Dept. of Hous. & Urb. Dev., 496 F. Supp. 3d 600, 611 (D. Mass. 2020). A plaintiff seeking an interim injunction bears the burden of demonstrating that each of the four factors weigh in his favor. Letourneau, 2015 WL 5167854, at *2.

If the Court consolidates the preliminary with the permanent injunctive relief request pursuant to Fed. R. Civ. 65(a)(2) as Plaintiffs request, as the parties seeking the injunction, they assume an additional burden. Doe v. Rhode Island Interscholastic League, ___ F. Supp. 3d ___, 2024 WL 2725475, at *6 (D.R.I. May 28, 2024), appeal filed, No. 24-1619 (1st Cir. July 1, 2024). Thus, to obtain a permanent injunction, a plaintiff must first make a showing of "actual

success" on the merits, and not "only a showing of likelihood of success on the merits as is required for a preliminary injunction." Id. (internal quotation marks omitted).

**B.    Lack of Subject Matter Jurisdiction – Fed. R. Civ. P. 12(b)(1)**[24]

"[F]ederal courts are courts of limited jurisdiction." Woo v. Spackman, 988 F.3d 47, 53 (1st Cir. 2021) (internal quotation marks omitted). The court "has the obligation, when there is any question, to confirm that it has subject matter jurisdiction prior to considering the merits of the underlying controversy." Sinapi v. Rhode Island Bd. of Bar Examiners, 910 F.3d 544, 549 (1st Cir. 2018). "The proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). In addressing a motion to dismiss for lack of subject matter jurisdiction, the court credits the pleaded factual allegations. Pona v. Weeden, C.A. No. 16-612S, 2017 WL 3279012, at *3 (D.R.I. June 29, 2017), adopted, 2017 WL 3278874 (D.R.I. Aug. 1, 2017). That is, ignoring "statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," the Court must take the "complaint's non-conclusory, non-speculative facts as true and draw all reasonable inferences in Plaintiffs' favor to determine whether the complaint indicates that the court has subject matter jurisdiction." Harper v. Rettig, 46 F.4th 1, 5-7 (1st Cir. 2022). Plaintiffs bear the burden of demonstrating the court's subject matter jurisdiction. Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co., 215 F.3d 195, 200 (1st Cir. 2000). When considering a Fed. R. Civ. P. 12(b)(1) motion, the court may consider materials outside the pleadings. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002).

**C.    Failure to State a Claim – Fed. R. Civ. P. 12(b)(6)**

---

[24] After the hearing on the Federal Defendants' Fed. R. Civ. P. 12(b) motion, Plaintiffs requested that the Court consider a written summary of their Fed. R. Civ. P. 12(b) argument. Mindful of Plaintiffs' *pro se* status, I have read this summary and considered these arguments. Text Order of Aug. 20, 2024.

To survive a 12(b)(6) challenge, a complaint must contain facts sufficient to support a claim of relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court must accept as true all well-pleaded facts and disregard all conclusory legal allegations. Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024). The Court must draw on its "judicial experience and common sense" to determine whether the claim is plausible, that is, whether the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## V.    ANALYSIS AND RECOMMENDATIONS

Plaintiffs' core assertion of entitlement to a preliminary/permanent injunction requires them to establish a substantial likelihood that they will succeed on the merits of a claim, as well as (for the permanent injunction) actual success on the merits.

My analysis begins with Plaintiffs' APA claim that HUD's action in approving the easements was made in derogation of their procedural rights as affected tenants to get notice, to comment and have their comments considered. I find that Plaintiffs have standing to assert such a claim based on 12 U.SC. § 1715z-1b because the request that the Project Sponsor, acting for WH I, submitted to HUD was for approval of a partial release of security, even though ultimately HUD did not approve a partial release of security. See DeSuze, 442 F. Supp. 3d at 540-41 (tenants have standing to bring APA case based on agency denial of procedural rights). I further find that Plaintiffs' complaint is adequate plausibly to assert this claim. Therefore, the Federal Defendants' motion to dismiss this claim pursuant to Fed. R. Civ. P. 12(b)(1) and (6) should be

denied.  This claim fails on the merits, however, because the evidence overwhelmingly and undisputedly establishes that Plaintiffs were afforded all of their procedural rights pursuant to § 1715z-1b in that they (and other WH I tenants) received notice of the parking/common area intermingling plan and were afforded ample opportunity to comment, that their comments were transmitted by the Project Sponsor to HUD, that Plaintiffs themselves bombarded HUD with letters and information supporting their comments and concerns, and that HUD specifically considered their comments.  See Dean, 336 F. Supp. 2d at 483-84.

     Turning to Plaintiffs' APA challenge alleging that HUD's determination regarding the easements is arbitrary and capricious, I find that such a claim fails at the threshold because it is based on nothing more than speculation that intermingling *might* lead to injury and because Plaintiffs have an adequate remedy in state court to redress any future breach of their right of quiet enjoyment of WH I.  5 U.S.C. § 704 (APA remedy reserved for agency actions causing injury for which there is no adequate remedy in court); see also Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (fear of future injury does not satisfy standing requirement if it is too speculative).  Thus, Plaintiffs lack standing to maintain such a claim in this Court.  See Greenleaf Ltd. P'ship v. Ill. Hous. Dev. Auth., Nos. 08 C 2480, 08 C 3446, 2009 WL 449100, at *6 (N.D. Ill. Feb. 23, 2009) (plaintiff with remedy in another court cannot seek review of HUD action in district court under APA).  Accordingly, I recommend that Plaintiffs' APA attack on HUD's decision should be dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(1).  See generally In re LastPass Data Sec. Incident Litig., ___ F. Supp. 3d ___, 2024 WL 3580646, at *4 (D. Mass. July 30, 2024) (standing is one requirement of subject matter jurisdiction).

     Mindful of Plaintiffs' *pro se* status, and positing that Plaintiffs somehow have a sufficient injury to support standing, I have also considered the merits of Plaintiffs' APA challenge to

HUD's determination regarding the easements.  This approach does not help them.  If the Court assumes without deciding that HUD's failure to object to the easements in issue amounts to an "[a]gency action made reviewable by statute [or a] final agency action," which is the APA predicate to judicial examination, 5 U.S.C. §§ 702, 704, I find that the evidence establishes that HUD's action regarding the easements was neither arbitrary nor capricious in that HUD carefully considered not just the Section 202 purpose established by Congress to expand the supply of supportive housing but also the impact of the intermingling on WH I elderly residents' quiet enjoyment and ability to live with dignity and independence.  Thus, HUD relied on the Middletown Planning Board's limitation of WH II tenants to persons 55 and over and on the Project Sponsor's advisory that the persons on the wait list for WH II were over 62, with most between 70 and 75, to find that the WH II tenants will be from a similar, if not identical, age group as those residing in WH I.  HUD further relied on the Project Sponsor's commitment, made in specific response to Plaintiff Newbury's comments, to add a security device to facilitate any access limitation that might hereafter become necessary to protect the WH I residents' quiet enjoyment of their units.  HUD also appropriately considered the significant need of the community for this project as reflected in the letters from elected legislators and in the decision of the Middletown Planning Board; these afford ample support for HUD's findings not only that the project, including the intermingling, is consistent with local needs, but also that there "will be no significant impacts on the health and safety of current or future residents of the community." HUD Dec. ¶ 30.  I find that there is a strong and rational connection between the facts found by HUD and the choice made by HUD and that HUD did not ignore any important aspect of the concerns raised by Plaintiffs.  See Ohio, 144 S. Ct. at 2053.  Accordingly, I conclude that HUD's factual determination is not arbitrary, or capricious or an abuse of discretion; to the contrary, as

required by the APA, HUD's determination regarding the easements is entitled to this Court's deference.  Based on these conclusions, to the extent that the Court does not adopt my recommendation that there is no standing, I alternatively recommend that the Court find that Plaintiffs have failed to demonstrate either a likelihood that they will succeed on the merits or actual success on the merits of their APA claim that HUD's decision regarding the easements was arbitrary, capricious, an abuse of discretion or otherwise contrary to law.

Based on the foregoing, I recommend that the Court deny Plaintiffs' motion for preliminary and permanent injunctive relief and enter final judgment against Plaintiffs and in favor of the Federal Defendants with respect to Plaintiffs' APA claim that HUD failed to comply with the procedural requirements of 12 U.S.C. § 1715z-1b.  As to the HUD's determination regarding the easements, I recommend that the Court dismiss Plaintiffs' APA challenge for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1).  If the Court does not adopt this recommendation, I alternatively recommend that the Court deny Plaintiffs' motion for preliminary and permanent injunctive relief and enter final judgment against Plaintiffs and in favor of the Federal Defendants with respect to Plaintiffs' APA claim that HUD's determination regarding the easements was arbitrary, capricious or otherwise contrary to law.

Also grounded in the APA, Plaintiffs rely on another argument – that allowing the 55-year-old and older residents of WH II to enter the common areas and parking lot of WH I is such a profound shift in federal housing policy that it cannot proceed without a new Congressional mandate in the form of new legislation or at least new HUD regulations promulgated through the APA rulemaking procedure.  This argument fails because, interpreted judicially as required by Loper Bright, the statutory framework already created by Congress does support age-group intermingling in an array of ways, all permitted as long as basic program objectives are adhered

30

to by the responsible agency, as HUD has done here.  By way of two examples, 42 U.S.C. § 1437e permits housing in a single residence of elderly and mentally disabled of any age, and specifically contemplates that "near-elderly" may be permitted not just access to common areas as in this case, but also to live in dwelling units "if there are insufficient numbers of elderly . . . to fill all units in a project."  42 U.S.C. §§ 1437e(a)(1), (3).  Further, Section 202 itself permits the mixing of persons under 62 in elderly housing as long as there is an anchor family member who is of the qualifying age.  12 U.S.C. § 1701q(k)(1).  Thus, to the extent that Plaintiffs' claim against the Federal Defendants rests on this argument, I recommend that it be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

After the hearing, Plaintiffs made filings asserting new APA-based arguments.  ECF Nos. 45, 46.  Having considered these in light of Plaintiffs' *pro se* status, I find that they ask the Court to order that various HUD officials appear and testify about every aspect of HUD's internal process for considering the intermingling plan (such as why the apparently non-existent office of elderly and assisted housing was not consulted) and regarding the factual merits of the Sponsor's plan.  Effectively, they request that the Court substitute its judgment for the factual findings of the agency.  Because such an approach would transgress the APA principle that a court may not "substitute its judgment for that of the agency," Ohio, 144 S. Ct. at 2053 (internal quotation marks omitted), I decline to do so.  See Loper Bright, 144 S. Ct. at 2259 (courts must deploy "deferential review . . . cabined to [agency] factbound determinations").  To the extent that Plaintiffs' APA claim against the Federal Defendants is deemed to rest on the premise that the Court should "do-over" HUD's fact finding and substitute its judgment for HUD's, I recommend that it be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Last, I pause to address Plaintiffs' wholly undeveloped claims against the Federal Defendants based on 28 U.S.C. § 4101, *et seq*. (federal court recognition of foreign defamation judgments) and 42 U.S.C. § 3604 (gender-based housing discrimination). I recommend that these be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). See n.4 *supra*. Similarly, to the extent that Plaintiffs' claims against the Federal Defendants are based on third-party beneficiary contractual rights that are not available to them as a matter of law, I recommend that they also be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. See Falzarano, 607 F.2d at 511.

To the extent that the Court does not adopt these case-ending (as to the Federal Defendants) recommendations, I also make the following findings and conclusion regarding Plaintiffs' alleged irreparable injury. In that regard, I find that Plaintiffs have failed to demonstrate any actual injury or harm arising from the proposed easements. Rather, as the Federal Defendants contend, I find that all of Plaintiffs' allegations of injury rest entirely on speculation that, despite all the accommodations made by the Project Sponsor and relied on by HUD to address Plaintiffs' intermingling concerns, some (perhaps many as Plaintiffs contend) of the persons who will be admitted as WH II tenants will be rowdy, disruptive or criminals. Plaintiffs have not presented a scintilla of evidence that this is true or even likely or even more plausible than the equally real possibility that some current WH I resident might hereafter become disruptive. Accordingly, I recommend that the Court find that Plaintiffs have failed to demonstrate irreparable harm, which is an essential element of their claim for preliminary and permanent injunctive relief and, therefore, an additional reason for entering judgment against Plaintiffs and in favor of the Federal Defendants in this case.

While this finding relieves the Court of the need to go further to balance the equities and examine the public interest, I find that the strong public interest in expanding affordable senior housing that would be materially injured by the requested injunction is too important for the Court to remain silent. Thus, I find that this is a case where the harm is entirely one-sided, in that an injunction would not just thwart the Congressional purpose expressed in Section 202 of expanding affordable housing, but also would impair the ability of municipal and state officials to address Middletown's "desperate[]" need for affordable housing for seniors. HUD Dec. Ex. 13 (ECF No. 13-13 at 18). In addition, I find that the evidence is sufficient to support the inference that the injunction would inflict financial injury on the non-profit Project Sponsor, potentially irreparable harm on the seniors on the wait list for WH II and expose residents of both WH I and WH II to a perpetually open and dangerous construction site as the hallway, *supra* n.8, sits unfinished. I find that this is not a close call – I recommend that the Court find that the balance of harms and the interest of the public overwhelmingly tips against the requested injunction so that it should be denied, both preliminarily and permanently.

That leaves Plaintiffs' state law claims of defamation.[25] These are asserted against two of the individual Federal Defendants (Aser and Morales), but only in their official capacities. ECF No. 12 at 3-4; ECF No. 31-1 at 4. "Because an action against a federal agency or federal officials in their official capacities is essentially a suit against the United States, such suits are . . . barred under the doctrine of sovereign immunity, unless such immunity is waived." Belton v. Wydra, Civil Action No. 3:17cv2006(KAD), 2019 WL 2162718, at *5 (D. Conn. May 17, 2019) (internal quotation marks omitted); see Anderson v. Heffernan, Civil Action No. 12-12173-FDS,

---

[25] Plaintiffs allege a "state tort of malicious defamation based on publication of lies and false light accusations." Newbury v. Church Cmty. Hous. Corp., C.A. No. 24-85WES, 2024 WL 1069945, at *1 (D.R.I. Mar. 12, 2024), adopted by text order (D.R.I. Mar. 26, 2024); see also ECF No. 12.

2013 WL 1629122, at *2 (D. Mass. Apr. 9, 2013) (well established that suit against federal officer in official capacity is suit against the United States subject to sovereign immunity). Plaintiffs have presented no basis for asserting a waiver of sovereign immunity permitting state law defamation claims for damages or injunctive relief against these federal officials in their official capacities.  Nor can the Court discern that one might be available.  Although the Federal Tort Claims Act ("FTCA") provides a limited waiver of sovereign immunity for torts committed by federal officials, Hornoff v. United States, 107 F.4th 46, 56 (1st Cir. 2024), it bars claims for defamation and false light.  Breda v. McDonald, 153 F. Supp. 3d 496, 505 (D. Mass. 2015) (defamation); Cadman v. United States, 541 F. App'x 911, 913 (11th Cir. 2013) (per curiam) (false light/invasion of privacy).  Further, injunctive relief is not an available remedy under the FTCA.[26]  In re Tuttle, Civ. No. 20-2523 (RMB-SAK), 2024 WL 3272302, at *13 (D.N.J. June 28, 2024); Hooker v. Knightly, Civil No. 17-cv-345-JNL, 2018 WL 1924459, at *3 (D. Me. Apr. 23, 2018), approved, Civil No. 17-cv-345-JNL, ECF No. 41 (D. Me. July 17, 2018) (same). Therefore, the state law defamation claims against these two Federal Defendants should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

As to the state law claims against the Project Sponsor and Defendant Byrne, as background for my *sua sponte* recommendation that these claims be dismissed without prejudice, a bit of case history is needed.  Plaintiffs originally filed two cases, one asserting the federal law claims against the Federal Defendants and the other asserting state law defamation claims. Newbury v. U.S. Dep't of Hous. & Urb. Dev., C.A. No. 24-84WES, 2024 WL 1076681, at *1-2 (D.R.I. Mar. 12, 2024).  After the case based on state law claims only was dismissed for lack of both federal question and diversity-based subject matter jurisdiction, Newbury v. Church Cmty.

---

[26] Plaintiffs request an "[o]rder from the Court that removes defamation of plaintiffs from all office files," which amounts to a request for a mandatory injunction.  ECF No. 12 at 19.

Hous. Corp., C.A. No. 24-85WES, 2024 WL 1069945, at *2 (D.R.I. Mar. 12, 2024), adopted by text order, (D.R.I. Mar. 26, 2024), Plaintiffs amended the complaint in this case (ECF No. 12) to bring these state law claims and state-law Defendants into it in reliance on the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. During the hearing, Plaintiffs confirmed that there are no federal law claims asserted against the Project Sponsor or Defendant Byrnes. Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), with all federal law claims gone, I recommend that the state law claims against the Project Sponsor and Defendant Byrne again be dismissed without prejudice. See DeSuze, 442 F. Supp. 3d at 544 (with federal law housing claims dismissed, "court sees no reason to retain jurisdiction over Plaintiffs' remaining state law claims . . . [and] therefore declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims").

## VI.    CONCLUSION

Based on the foregoing, to the extent that Plaintiffs rely on injury redressable pursuant to the APA arising from breach of the procedural requirements of 12 U.S.C. § 1715z-1b, I recommend that the Court deny the Federal Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6), deny Plaintiffs' motion for preliminary injunction, consolidate the preliminary and permanent injunctions pursuant to Fed. R. Civ. P. 65(a)(2) and enter judgment on the merits against Plaintiffs and in favor of the Federal Defendants. To the extent that Plaintiffs assert an APA claim alleging arbitrary and capricious agency factfinding by HUD resulting from their speculation that this could lead to a breach of their right to quiet enjoyment of their dwelling units, I find that Plaintiffs lack standing because their injury is based on speculation regarding future events and because of the adequacy of Plaintiffs' remedy in state court to redress any injury that may arise in the future; accordingly, I recommend that such claims against the

Federal Defendants should be dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(1). Alternatively, finding that the evidence establishes that HUD's decision was neither arbitrary nor capricious, but was consistent with applicable law, I recommend that the Court deny Plaintiffs' motion for preliminary injunction, consolidate the preliminary and permanent injunctions pursuant to Fed. R. Civ. P. 65(a)(2) and enter judgment on the merits of this APA claim against Plaintiffs and in favor of the Federal Defendants. As to Plaintiffs' remaining claims against the Federal Defendants – housing, defamation (pursuant to 28 U.S.C. § 4101 and state law), gender discrimination, "Elder Abuse," and breach of contract – I recommend that they be dismissed with prejudice for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). And with all federal law claims gone, pursuant to 28 U.S.C. § 1367(c)(3), I recommend that the Court *sua sponte* dismiss without prejudice the state law claims against the Project Sponsor and Defendant Byrne and terminate the case.[27]

Any objections to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this report and recommendation. See Fed. R. Civ. P. 72(b); DRI LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 20, 2024

---

[27] One loose end: in the midst of the briefing on the two motions that are addressed in depth in this report and recommendation, Plaintiffs filed a motion for partial summary judgment (ECF No. 20) that asserts that HUD improperly relied on a representation from the Project Sponsor that notice to and comment from tenants was not required, as well as that HUD's determination was not made by the correct HUD officials. Both of these arguments are materially disputed by the HUD Declaration of Joseph Crisafulli (ECF No. 13-15 ¶¶ 1-3, 27-40) and related attachments. Because the facts are disputed, I recommend that Plaintiffs' motion for partial summary judgment – ECF No. 20 – be denied.